SRD/USAO#2022R00414
hmg.12.17.25

## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| | * |
| | *   **Criminal No. JRR-01:24-CR-296** |
| | * |
| v. | * |
| | *   **(Conspiracy to Commit Wire Fraud, 18 U.S.C.** |
| | *   **§ 1349; Wire Fraud, 18 U.S.C. § 1343; Major** |
| VICTOR M. MARQUEZ, | *   **Fraud Against the United States, 18 U.S.C.** |
| | *   **§1031; Forfeiture, 18 U.S.C. §§ 981(a)(1)(C),** |
| Defendant. | *   **982(a)(3)(C), 28 U.S.C. § 2461(c), 21 U.S.C. §** |
| | *   **853(p))** |
| | * |
| | * |
| | * |
| | * |

## SUPERSEDING INDICTMENT

The Grand Jury for the District of Maryland charges:

### COUNT ONE
(18 U.S.C. § 1349: Conspiracy to Commit Wire Fraud)

At all times relevant to this Superseding Indictment:

1.      The United States Department of Defense ("DoD")[1] regularly purchased information technology ("IT") solutions from outside vendors to satisfy specific operational needs to manage, secure, and protect sensitive data. The contracts awarded by DoD to obtain hardware and software IT products ("IT Products") often totaled millions of dollars.

2.      In 2018 and 2019, a DoD agency ("Agency 1") decided to purchase data centers that it planned to operate in Maryland and Hawaii (the "2019 Data Center Procurement"). After

---

[1] On September 5, 2025, the President issued an executive order that, among other things, authorized a secondary title for the Department of Defense—the Department of War. *See* Exec. Order No. 14347, 90 C.F.R. 43893 (Sep. 5, 2025), *available at* https://www.federalregister.gov/documents/2025/09/10/2025-17508/restoring-the-united-states-department-of-war. At all times relevant to this Superseding Indictment, the authorized name was the Department of Defense.

conducting a thorough analysis of internal and market factors, Agency 1 set a budget of $5 million per data center for a total of $10 million. This budgetary information was nonpublic.

3.    Agency 1 procured IT Products through a sales channel that included manufacturers, distributors and resellers. Manufacturers sold IT Products to distributors, which in turn sold them to resellers. Resellers then sold the IT Products to Agency 1.

4.    Before contracting for IT Products, such as the 2019 Data Center Procurement, DoD implemented a procurement procedure designed to ensure fair competition. A competitive bidding process—free from favoritism, corruption, or bid rigging—benefited the DoD because, by giving multiple vendors a chance to bid on a contract, DoD encouraged the private sector to offer the best possible products and services at the lowest possible price in order to provide the DoD—and the American taxpayers who fund it—the best possible value.

5.    To that end, the DoD's procurement procedures required every contract bidder to submit, among other things:

a.    A "Certificate of Independent Price Determination" certifying that "[t]he prices in this offer have been arrived at independently" and without communicating, coordinating or agreeing with any other bidder concerning the various bids.

b.    A "Certification and Disclosure Regarding Payments to Influence Certain Federal Transactions," certifying that "no Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency" to obtain the contract.

*The Co-Conspirators and Relevant Entities*

6.    Defendant **VICTOR M. MARQUEZ** founded, owned, and operated "Company 1" and "Company 2." Company 1 provided on-site IT services to the United States Government,

2

including consultant work related to Agency 1's procurements such as the 2019 Data Center Procurement. Company 2 was an IT Products reseller to the United States Government. As the owner of Company 1 and Company 2, **MARQUEZ** had personally signed—and was therefore knowledgeable about—the "Certification of Independent Price Determination" and "Certification and Disclosure Regarding Payments to Influence Certain Federal Transactions."

7.  ANTWANN RAWLS, an employee of Company 1, provided on-site technology support to Agency 1, including for data centers. RAWLS had access to government facilities and nonpublic government information related to upcoming procurements such as the 2019 Data Center Procurement.

8.  JAMES BRIAR was an account representative employed by "Company 3," an IT Products distributor to the United States Government.

9.  SCOTT REEFE was a sales executive employed by "Company 4," a manufacturer that sold IT Products and services to the United States Government via distributors.

10.  ROBERT FAY was a sales executive employed by "Company 5," a reseller of IT Products to the United States Government.

*The Scheme to Defraud*

11.  From as early as 2018 and continuing through 2022, in the District of Maryland and elsewhere, the Defendant,

**VICTOR M. MARQUEZ,**

and others both known and unknown to the Grand Jury, did knowingly and with the intent to defraud, devise and intend to devise a scheme and artifice to defraud ("scheme to defraud") and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises; that is, **MARQUEZ** knowingly and intentionally defrauded the DoD, including

Agency 1, by causing, making, and submitting materially false, fraudulent, and misleading statements and by concealing material facts, including that IT contract bids were not independent, competitive or free from unfair influence and that Marquez received funds from IT Product procurements in exchange for his influence, in violation of Title 18, United States Code, Section 1343.

*The Conspiracy to Execute the Scheme to Defraud*

12.    From as early as 2018 and continuing through at least as late as 2022, in the District of Maryland and elsewhere, the Defendant,

**VICTOR M. MARQUEZ,**

did knowingly and willfully conspire, combine, confederate, agree with RAWLS, REEFE, BRIAR, FAY, and other persons known and unknown to the Grand Jury to commit wire fraud; that is, to knowingly execute and attempt to execute the scheme to defraud using interstate wires, in violation of Title 18, United States Code, Section 1349.

*The Purpose of the Conspiracy*

13.    The purpose of the conspiracy was for **MARQUEZ** and his co-conspirators to obtain money from Agency 1 by engaging in deceptive conduct relative to the bidding process for IT Products. The deceptive conduct included submitting bids and certifications for IT Products contracts that they knew were materially false and concealing material facts related to procurements by Agency 1 for IT Products. For example, while the bids were represented to be independent, competitive, and free from unfair influence, **MARQUEZ** and his co-conspirators knew the opposite was true – the bids were coordinated, anti-competitive, and were submitted after using unfair practices.

14.    As a result of the scheme to defraud, **MARQUEZ** and Company 2 obtained more than $3.8 million from the United States Government.

4

*Manner and Means*

15.    The manner and means by which **MARQUEZ** and his co-conspirators sought to accomplish the conspiracy and the scheme to defraud included:

a.    **MARQUEZ** and RAWLS abused their positions as on-site contractors at Agency 1 to obtain nonpublic information about the 2019 Data Center Procurement and other procurements for IT Products.

b.    **MARQUEZ**, REEFE, and BRIAR agreed to rig bids for the 2019 Data Center Procurement and other procurements. The rigged bids were purposefully non-competitive because they were designed to ensure that a particular bidder was awarded the contract. In the case of the 2019 Data Center Procurement, the co-conspirators intended that Company 2 would be awarded the contract.

c.    **MARQUEZ** and his co-conspirators knowingly and intentionally submitted and caused to be submitted false "Certificate of Independent Price Determination" and "Certification and Disclosure Regarding Payments to Influence Certain Federal Transactions" documents to Agency 1 and submitted fraudulently inflated prices to Agency 1 in response to market research requests.

d.    **MARQUEZ** and his co-conspirators concealed **MARQUEZ**'s role as to other procurements at Agency 1. For example, as to at least two additional procurements by Agency 1, the Design Refresh Procurement and the Expansion Procurement, **MARQUEZ** provided an unfair advantage to Company 5 by using misappropriated nonpublic information, bid rigging, and the submission of false certifications to Agency 1.

e.  In exchange, **MARQUEZ**, REEFE, FAY, and BRIAR agreed and caused the payment of kickbacks to **MARQUEZ**. The kickbacks to **MARQUEZ** were built into the bids that were submitted by Company 5 for Agency 1 procurements.

f.  After winning the 2019 Data Center Procurement and other procurements, **MARQUEZ** and his co-conspirators transferred and shared the proceeds of the scheme to defraud.

*Acts In Furtherance of the Conspiracy and Scheme to Defraud*

16.    In furtherance of the conspiracy and scheme to defraud, and to accomplish their objects, at least one of the conspirators committed the following acts (among others) in the District of Maryland and elsewhere:

2019 Data Center Procurement

a.  On or about May 22, 2018,[2] **MARQUEZ** formed Company 2 in Maryland.

b.  On or about May 24, 2018, **MARQUEZ** instructed RAWLS to conceal **MARQUEZ**'s ownership of Company 2 from Agency 1 (where RAWLS was an on-site contractor), writing: "going to create you a [Company 2] account . . . no more [Company 1] for sales/quotes etc…separation starts today…anyone ask [sic] .. its [sic] a small company."

c.  On or about October 10, 2018, a representative of Company 3 signed and submitted annual certifications in SAM.gov on behalf of Company 3 including the Certification and Disclosure Regarding Payments to Influence Certain Federal Transactions and the Certification of Independent Price Determination. Company 3 certified compliance with the same certifications in SAM.gov numerous times

_____

[2] Unless otherwise specified, all dates are on or about.

6

during the relevant period, including on or about June 21, 2019, August 21, 2020, August 26, 2021, and May 23, 2022.

d. On or about October 15, 2018, RAWLS wrote to **MARQUEZ** regarding the 2019 Data Center Procurement quotes: "as long as the[y] cost less [than] 5 million per site…that is budgetary constraint I was told to keep both sites less than 5 million per and as you know we like to leave a buffer…"

e. On or about October 15, 2018, **MARQUEZ** emailed BRIAR requesting price quotes for the 2019 Data Center Procurement within Agency 1's budgetary parameters, writing that the quotes "gotta be under 10M for both …"

f. On or about December 6, 2018, a representative of Company 5 signed and submitted annual certifications in SAM.gov on behalf of Company 5 including the Certification and Disclosure Regarding Payments to Influence Certain Federal Transactions and the Certification of Independent Price Determination. Company 5 certified compliance with the same certifications in SAM.gov numerous times during the relevant period, including on or about July 3, 2019, June 18, 2020, September 20, 2021, and December 1, 2022.

g. On or about December 12, 2018, **MARQUEZ** signed and submitted annual certifications in SAM.gov on behalf of Company 2 including the Certification and Disclosure Regarding Payments to Influence Certain Federal Transactions and the Certification of Independent Price Determination. **MARQUEZ** signed and submitted the same certifications in SAM.gov on behalf of Company 2 on or about August 14, 2019, November 4, 2019, May 3, 2020, September 29, 2020, March 21, 2021, July 23, 2021, and October 26, 2022.

h. On or about January 24, 2019, REEFE emailed **MARQUEZ** and BRIAR, asking them to find out if there was a third bidder for the 2019 Data Center Procurement and asking BRIAR "send your responses in today? And maybe throw in a third bid with [an affiliate of Company 3] James??"

i. On or about January 24, 2019, BRIAR emailed a contracting specialist at Agency 1, "I just got off the phone with [Company 4] and they wanted to make sure you were going to get three bids back. They let me know one other partner named [Company 2] reached out to them to confirm pricing but no one else had reached out and they were worried you wouldn't get enough responses." In sending this email, BRIAR concealed from Agency 1 that he was coordinating bids and communicating with **MARQUEZ**.

j. On or about January 24, 2019, BRIAR emailed others at Company 3 about his intent to submit an intentionally noncompetitive for the 2019 Data Center Procurement: "Also [Agency 1] procurement reached out directly to [Company 3] so I will be submitting a high price third bid, is there any easy way to get all of the skus on your quote into my [Company 3 system] without me just copy pasting?"

k. On or about January 24, 2019, BRIAR coordinated the submission of Company 3's bid with **MARQUEZ**'s submission of Company 2's bid for the 2019 Data Center Procurement: "Hey Vic [**MARQUEZ**], Can you let me know when you [sic] bids are submitted, I want to wait for you to submit yours before I submit just to make sure everything is good to go. I'm getting everything prepped on my side now."

l. On or about January 25, 2019, **MARQUEZ** emailed bids on behalf of Company 2 for each of the 2019 Data Center Procurements to Agency 1.

m.  On or about January 31, 2019, **MARQUEZ** signed the contracts for the 2019 Data Center Procurements on behalf of Company 2. **MARQUEZ** bid for the contracts at approximately \$4.85 million per data center—or roughly \$150,000 below Agency 1's internal budget limit of \$5 million per data center.

n.  On or about May 9, 2019, after Agency 1 awarded the 2019 Data Center Procurement to Company 2 and paid Company 2, **MARQUEZ** transferred the proceeds from a bank account ending in x1978 in the name of Company 2 to a bank account ending in x1343 in the name of Company 2.

o.  On or about July 3, 2019, a co-conspirator texted **MARQUEZ**, stating that RAWLS "is a goddamn super MOLE!!! Glad he's on your payroll."

p.  On or about October 16, 2019, **MARQUEZ** sent an email to discuss adapting the strategy for winning an upcoming Agency 1 procurement without using Company 2: "[Company 2] will forward to [Company 5] .. who will forward to their customer."

q.  On or about September 16, 2020, FAY emailed a co-conspirator further describing the plan to win the procurement while concealing **MARQUEZ's** participation from Agency 1: "We NEED everything to go through [Company 3]. Talked to [**MARQUEZ**], we're taking the deal down, [**MARQUEZ**] is being taken care of by [Company 3] on the backend."

<u>Design Refresh Procurement</u>

r.  On or about September 16, 2020, BRIAR emailed others at Company 3 explaining that Company 2 and Company 5 would be working together to win an upcoming Agency 1 procurement and to conceal Company 2's involvement from Agency 1:

"Technically this is registered to [Company 2] but [Company 5] will be the customer facing partner."

s.  On or about September 16, 2020, BRIAR emailed **MARQUEZ** and another co-conspirator requesting that **MARQUEZ** provide his bid prices for the procurement.

t.  On or about September 16, 2020, Company 5 submitted a quote to Agency 1 in response to the Design Refresh Procurement that concealed from Agency 1 that funds from the procurement would be paid to Company 2.

u.  On or about September 17, 2020, BRIAR emailed FAY and provided **MARQUEZ**'s bid prices so that FAY would "know what the ceiling price is for the entire [bill of materials]."

v.  On or about September 17, 2020, FAY instructed BRIAR "to be sure there's an equitable split between [Company 2 and Company 5]" with respect to the allocation of proceeds in the bid FAY and BRIAR were preparing to submit to Agency 1 on behalf of Company 5.

w.  On or about September 23, 2020, after Agency 1 awarded the procurement to Company 5 (as **MARQUEZ** and his-conspirators intended), REEFE emailed **MARQUEZ**, "THANK YOU VIC!!!! Team work [sic] makes the dream work!!!"

x.  On or about March 31, 2021, Company 3 transferred $534,064.64 to Company 2, which included a kickback payment of $443,282.28 for **MARQUEZ**.

### Expansion Procurement

y.  On or about December 15, 2020, FAY emailed BRIAR and REEFE regarding another upcoming procurement by Agency 1, which would include a kickback for **MARQUEZ**. FAY attached a quote on Company 2 letterhead and wrote, "I'll need

10

the attached from [Company 3] to respond to the [Request for Quote]. . . . My price should look like the attached with reserve/rebate margin for [Company 2]." And in a  separate email, FAY directed that there "[s]hould be a 60/40 split" between Company 2 and Company 5.

z.   On or about December 15, 2020, REEFE emailed FAY, **MARQUEZ** and others that Agency 1 had "requested a quote from someone other than [Company 2] . . . . So [Company 2] asked [Company 5] to provide the renewal . . . . [Company 2] and [Company 5] stakeholders are on this thread to confirm."

aa.  On or about April 11, 2022, FAY emailed BRIAR and REEFE asking BRIAR for a quote for an upcoming procurement by Agency 1, requesting that BRIAR increase the bid price to incorporate a kickback to **MARQUEZ**, and stating "Please increase my [] price to 2119184.22 and hold the extra from that change for a[] [Company 2] rebate." REEFE responded to BRIAR: "I gotta price in the Vic tax or did you do that already James??"

bb.  On or about April 13, 2022, Company 5 submitted a quote to Agency 1 in response to the Expansion Procurement that concealed from Agency 1 that funds from the procurement would be paid to Company 2.

cc.  On or about August 10, 2022, Company 3 issued a check to Company 2 for $257,274 which was the kickback payment for **MARQUEZ**.

dd.  On or about August 24, 2022, **MARQUEZ** deposited the $257,274 check into a bank account in the name of Company 2.

18 U.S.C. § 1349

## COUNTS TWO, THREE, FOUR, FIVE
### (18 U.S.C. § 1343: Wire Fraud)

The Grand Jury for the District of Maryland further charges that:

1.      The allegations in Paragraphs 1 through 11 and 13 through 16 are incorporated herein by reference.

2.      On or about the dates set forth below, in the District of Maryland and elsewhere, the Defendant,

### VICTOR M. MARQUEZ,

knowingly and willfully executed and attempted to execute the scheme to defraud with the intent to defraud the United States and to obtain money and property by means of materially false and fraudulent pretenses, representations, promises, and material omissions, and for the purpose of executing such scheme to defraud did knowingly transmit and cause to be transmitted by means of wire communication, in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, fraudulently procured payments, as set forth below:

| COUNT | DATE | PROCUREMENT | DESCRIPTION |
|---|---|---|---|
| 2 | May 7, 2019 | 2019 Data Center Procurement | Payment of $8,195,992.52 from United States Government to Company 2. |
| 3 | May 9, 2019 | 2019 Data Center Procurement | Second payment of $1,448,974.79 from United States Government to Company 2. |
| 4 | March 31, 2021 | Design Refresh Procurement | Payment of $443,282.28 from Company 3 to Company 2. |
| 5 | August 10, 2022 | Expansion Procurement | Payment of $257,274 from Company 3 to Company 2. |

18 U.S.C. § 1343
18 U.S.C. § 2

12

## COUNT SIX
(18 U.S.C. § 1031: Major Fraud)

The Grand Jury for the District of Maryland further charges that:

1.        The allegations in Paragraphs 1 through 11 and 13 through 16n are incorporated herein by reference.

2.        From as early as 2018 and continuing through at least as late as May 2019, in the District of Maryland and elsewhere, the Defendant,

**VICTOR M. MARQUEZ,**

in connection with the 2019 Data Center Procurement that was awarded to Company 2 on January 31, 2019, and was valued at $1 million or more, knowingly executed and attempted to execute the scheme to defraud with the intent to defraud the United States and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

18 U.S.C. § 1031
18 U.S.C. § 2

## FORFEITURE ALLEGATIONS

The Grand Jury for the District of Maryland further finds that:

1.      Pursuant to Fed. R. Crim. P. 32.2, notice is hereby given to the Defendant **MARQUEZ** that the United States will seek forfeiture as a part of any sentence in accordance with 18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 982(a)(3)(C), 21 U.S.C. § 853(p), and 28 U.S.C. § 2461(c), in the event of Defendant's convictions on the offenses alleged in Counts One through Six of this Indictment.

2.      Upon conviction of any of the offenses alleged in Counts One through Six of this Indictment, the Defendant,

### VICTOR M. MARQUEZ,

shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(3)(C), any property constituting, or derived from, proceeds obtained directly or indirectly, as the result of such offense, including but not limited to a forfeiture money judgment of at least $3.8 million.

3.      Upon conviction of the offense alleged in Counts One through Six of this Indictment, Defendant,

### VICTOR M. MARQUEZ,

shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property constituting, or derived from, proceeds obtained directly or indirectly, as the result of such offense, including but not limited to a forfeiture money judgment of at least $3.8 million.

### Substitute Assets

4.      If any of the property described above, as a result of any act or omission of the defendant:

   a.      cannot be located upon the exercise of due diligence;

14

b.    has been transferred or sold to, or deposited with, a third party;

c.    has been placed beyond the jurisdiction of the Court;

d.    has been substantially diminished in value; or

e.    has been commingled with other property that cannot be divided without difficulty;

the United States shall be entitled to forfeiture of substitute property up to the value of the forfeitable property described above pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c).

18 U.S.C. §982(a)(3)(C)
18 U.S.C. § 981(a)(1)(C)
28 U.S.C. § 2461(c)
21 U.S.C. § 853(p)

ABIGAIL SLATER
Assistant Attorney General

KELLY O. HAYES
United States Attorney

_____
ELIZABETH H. FRENCH
ANNA WANG
RONALD FIORILLO
Trial Attorneys
Antitrust Division
U.S. Department of Justice
Washington Criminal Section
450 5th Street, NW
Washington, D.C. 20530

_____
SEAN R. DELANEY
DARREN S. GARDNER
Assistant United States Attorney
United States Attorney's Office
District of Maryland
36 South Charles Street, Fourth Floor
Baltimore, Maryland 21201

A TRUE BILL:

SIGNATURE REDACTED
Foreperson

Date: 12/17/25

15